UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                                  :
DONNA MARIE MCCARTHY        :            3:16 CV 1716 (JGM)
                                    :
V.                                  :
                                    :
CAROLYN W. COLVIN,[1]        :
ACTING COMMISSIONER OF     :
SOCIAL SECURITY          :           DATE: JANUARY 22, 2018
                                    :
------------------------------------------------------- x

## RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE DECISION OF THE COMMISSIONER AND ON DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"].

## I.  ADMINISTRATIVE PROCEEDINGS

On July 16, 2013, plaintiff filed an application for DIB benefits claiming that she has been disabled since August 19, 2011, due to a protruding disc in her back; numbness in her arm and feet; back injury; arthritis; headaches (migraines); pain in her neck and shoulders; pain running down her legs; pain in her knees; cramping in her arms, legs, feet, toes, and fingers; "chronic fatiage [sic]"; dizzy spells; and loss of balance. (Certified Transcript of Administrative Proceedings, dated November 30, 2016 ["Tr."] 165-66, 181). Plaintiff's application was denied initially (Tr. 92-99; see also Tr. 91, 110-13) and upon reconsideration (Tr. 101-09; see also Tr. 100, 114-16).[2] On December 2, 2013, plaintiff

_____

[1]At the time this action was filed, Carolyn W. Colvin was the Acting Commissioner of Social Security.  On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

[2]Plaintiff has been represented by counsel since November 14, 2013. (Tr. 117-18).

requested a hearing before an Administrative Law Judge ["ALJ"](Tr. 119-20; see also Tr. 121-52, 159-62). ALJ Eskunder Boyd held plaintiff's hearing on January 26, 2015, at which time plaintiff and a vocational expert, who was present by telephone, testified. (Tr. 49-90; see also Tr. 153-58, 163-64). On March 10, 2015, ALJ Boyd issued an unfavorable decision. (Tr. 30-48). On May 4, 2015, plaintiff requested review of the hearing decision, and additional time to submit a statement in support of her request for review. (Tr. 27-29; see also Tr. 248-56). By letter dated June 7, 2015, plaintiff was granted an additional twenty-five days to submit evidence for review by the Appeals Council (Tr. 25-26); on March 15, 2016, plaintiff submitted additional medical evidence. (Tr. 7-24, 257). On August 24, 2016, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On October 17, 2016, plaintiff filed her complaint in this pending action (Dkt. #1), and on December 22, 2016, defendant filed her answer. (Dkt. #10).[3] On January 10, 2017, the case was transferred to this Magistrate Judge upon consent of the parties. (Dkt. #13; see also Dkt. #12). On February 17, 2017, plaintiff filed her Motion for Order Reversing the Decision of the Commissioner, with brief in support (Dkt. #14),[4] which was followed by defendant's Motion for an Order Affirming the Decision of the Commissioner and brief in support on June 19, 2017. (Dkt. #20; see also Dkts. ##15-19). On July 19, 2017, plaintiff filed a Memorandum in Opposition to Defendant's Motion for an Order Affirming the Decision of the Commissioner. (Dkt. #24; see also Dkts. ##21-23).

_____

[3]Attached to defendant's answer is the Administrative Transcript. There is some duplication in the record.

[4]Plaintiff also filed a seventeen page Medical Chronology (Dkt. #14-2), which defendant "supplement[ed]" with eight additional pages in her brief. (Dkt. #20, Brief at 2-7).

For the reasons stated below, plaintiff's Motion for Order Reversing the Decision of the Commissioner (Dkt. #14) is <u>granted in part and denied in part</u>, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #20) is <u>denied</u>.

II. FACTUAL BACKGROUND

A. HEARING TESTIMONY AND ACTIVITIES OF DAILY LIVING

At the time of her hearing, plaintiff was sixty-three years old and lived in a one-level home with her husband and two adult children. (Tr. 60-61). Plaintiff has had vertigo her "whole life[]" and has trouble going up and down stairs, is off-balance and unsteady on her feet, gets light-headed and dizzy, and "walk[s] around hanging onto the table or the chair[]" in order to avoid falling. (Tr. 70). Plaintiff experiences daily pain "more or less from the neck down to [her] feet[,]" which is aggravated by walking short distances and by back spasms that cause shooting pain in her shoulders and neck. (Tr. 72; <u>see also</u> Tr. 191, 194). Plaintiff estimated that her pain rating averages as an eight on a one-to-ten scale (Tr. 73), and she treats it at home with a heating pad, cold compress, and "a lot of Aleve[]" to reduce the pain to "about six." (Tr. 72-73). Plaintiff testified that she has been prescribed different pain medications, including morphine, Percocet, Voltaren, Prednisone, and Fentanyl patches, many of which caused her to be "sick for [] days" with vomiting, light-headedness, and dizziness, and none of which significantly improved her pain. (Tr. 71, 73, 81). Plaintiff was supposed to go for pain management but "never made it." (Tr. 81). Plaintiff testified that Dr. Varma told her that "pain medicine really wouldn't help with what [she] ha[s]." (<u>Id.</u>). Plaintiff sleeps only two to two-and-a-half hours each night and experiences back spasms and charley horses in her legs, her elbows "lock up on [her]" and she "sleep[s] with pillows everywhere on [her] body." (Tr. 69; <u>see also</u> Tr. 191).

Plaintiff last worked on August 19, 2011 as a full-time slot machine attendant at Mohegan Sun; she testified that she "couldn't do [the job]" because of "surgery on [her] neck and . . . arms[,]" a fall at the casino, "leg pains, cramping, numbness[,]" back spasms, numbness in her feet, and trouble with her lower back and the back of her neck (Tr. 63-64), and because of "all the equipment that [she had] to carry . . . [and] [a]ll the walking." (Tr. 67). Plaintiff attempted to reduce her pain at work by wearing "a hard pair of leather shoes[,]" wrapping her knees, wearing a back brace, and wearing suspenders to redistribute the weight of the belt she was required to wear, which held a radio, "ninjas," her wallet, pad, pencils, and a calculator; these adjustments did not help. (Tr. 79). Plaintiff testified that she was often reprimanded on the casino floor for trying to sit down or lean against something "just to alleviate some of the pain[,]" or for taking the radio off her belt to "eliminate some of that weight." (Tr. 80). Plaintiff collected unemployment benefits after leaving Mohegan Sun, but testified that she would have tried to work had she found a job that did not require her to stand as much. (Tr. 64-66, 79).

Plaintiff "occasionally" relies on a wall as an assistive device for keeping her balance (Tr. 62); her hands "cramp up" when she writes for five to thirty minutes (Tr. 63); and she is able to dress, groom and bathe herself, but uses a shower chair and only showers when someone else is home because she has "passed out in the shower and fallen." (Tr. 67; see also Tr. 191, 212). Plaintiff helps her husband get up in the morning, makes coffee, and then returns to bed to lay down once he leaves for work. (Tr. 69). Plaintiff cooks small meals, vacuums "very small rooms" in her home while sitting down, and dusts "the lower part of the house[]" to avoid reaching. (Tr. 68, 192). Plaintiff rarely drives; she "may run to the store to pick up milk" but she testified that the drive to her

administrative hearing "was pretty challenging for [her]." (Tr. 69; <u>see also</u> Tr. 193, 211). Plaintiff's son or husband takes care of the family's grocery shopping and her son does "most of" the family's laundry. (Tr. 70; <u>see also</u> Tr. 194). Plaintiff's ability to perform household chores is limited by her COPD and fibromyalgia, which "make it difficult to breath[e] [and] move freely." (Tr. 193, 211). She uses a back brace and a Tens device at home. (Tr. 196).

Plaintiff can lift "two pounds[]" and carry "light groceries[]" such as cereal and bread, and can lift, but not carry, a gallon of milk. (Tr. 74-75). Plaintiff explained that she cannot carry grocery items because she has "a hard time walking[]" such that she requires a shopping cart to support her. (Tr. 74-75, 80; <u>see also</u> Tr. 194). Plaintiff can walk from the parking lot into the store, but cannot walk for even half a city block without stopping. (Tr. 75). Plaintiff can walk short distances from her home, but needs to sit down and take a break before returning home. (Tr. 196, 207). In a single stretch, plaintiff can stand for thirty to forty-five minutes. (Tr. 76). Plaintiff can "sit for a while[]" but cannot, while standing, bend over to touch her toes without falling. (<u>Id.</u>). She can touch her knees from a standing position and lean over the sink to do dishes, but cannot squat or climb stairs due to pain in her back and the back of her legs; she can reach her right arm, but not her left, over her head; she can reach her arms out in front of her; she can use her hands to hold larger objects like a grapefruit; but she has "a hard time[]" using her fingers on small objects like buttons or zippers, and cannot shuffle and deal a deck of cards or hold an orange in one hand while peeling it with the other. (Tr. 76-77). Plaintiff completed two Activities of Daily Living ["ADL"] forms: on August 6, 2013 (Tr. 190-97) and November 2, 2013 (Tr. 206-13). Plaintiff reported that she is always in pain; does not

sleep well; experiences cramps in her legs, knees, and feet; and cannot climb stairs, do laundry, clean her home, shop for groceries, go for long walks, use both arms, go for long car rides, or do arts and crafts. (Tr. 191, 194). She further reported that her conditions affect lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, and using her hands (Tr. 195, 209), because she has a "pinch[ed] nerve in [her] lower back that press[es] on the nerve [which] cause[s] a lot of pain in [her] lower back that radiates down [her] legs [and] knees and into [her] feet." (Tr. 195). Exposure to cold, humidity, and wetness aggravate plaintiff's symptoms. (Tr. 77-78).

The vocational expert testified that plaintiff's only past relevant work was as a slot machine attendant, which is unskilled, light work. (Tr. 84). The vocational expert testified that a hypothetical person limited to light work who can never climb ladders, ropes or scaffolds; occasionally climb stairs and ramps; occasionally balance, stoop and crouch; never kneel or crawl; frequently handle and finger; but not work in exposure to cold, could perform plaintiff's past relevant work. (Id.). Assuming the same hypothetical, except that the person can never climb stairs and cannot reach overhead with the left upper extremity, the vocational expert testified that such a person would still be able to perform plaintiff's past relevant work. (Tr. 85). If that person were also limited to standing and walking for up to two hours total and sitting for up to six hours total, the vocational expert testified that such a person would not be able to perform plaintiff's past relevant work. (Id.). The vocational expert testified that plaintiff has no transferrable skills. (Tr. 86).

<u>B. MEDICAL RECORDS</u>

The administrative transcript includes medical records from April 2000 (Tr. 300-01) through November 2015 (Tr. 17-19); however, many of these records do not relate to plaintiff's conditions during the relevant time, do not discuss plaintiff's alleged impairments, or are duplicative. While the Court has reviewed all medical records in the Administrative Transcript, it will focus on plaintiff's medical records from the alleged onset of her disability on August 19, 2011, through her date last insured on December 31, 2016. Similarly, this decision will not address medical records that do not relate to plaintiff's alleged causes of disability. (<u>See, e.g.</u>, Tr. 311-31, 439, 457-67, 477-82, 491-92, 494-500, 502-08, 532-34, 537-50, 555-60 (uninterpreted lab results); 332-36 (radiology reports); 337-41 (sinus rhythm); 342 (testing request)). However, the Court will discuss any additional records that may shed light on plaintiff's condition during the relevant time period.

<u>1. MEDICAL RECORDS PRECEDING ALLEGED ONSET OF DISABILITY</u>

Starting in April 2000 (Tr. 300-02), plaintiff began medical treatment for vertigo and headaches (Tr. 258, 262-64, 267-69, 280-81, 283-87, 300-01, 347-48), which were suggestive of migraine (Tr. 263-69, 273, 302-03, 347-48) and sometimes caused her to miss work (Tr. 267-68, 273, 286). Plaintiff sometimes treated her vertigo with Zyrtec, which made her sleepy (Tr. 286, 295-96), or with Calan and Antivert (Tr. 281). Although Imitrex resolved plaintiff's vertigo and headaches, plaintiff was a smoker with high cholesterol and this medication put plaintiff at increased risk such that it required close supervision. (Tr. 266-67). In August 2003, plaintiff presented to Dr. Claire Warren, a family physician, reporting that she became dizzy getting out of bed, fell, and "pass[ed]

out[]" a few minutes later. (Tr. 279). When she awoke, plaintiff experienced discomfort on the left side of her chest, but her chest X-ray was normal. (Id.). Plaintiff was treated for chest wall strain and vertigo with a syncopal episode. (Tr. 275-79). Plaintiff reported additional syncopal episodes in June 2006, at which time she was referred for further evaluation (Tr. 259, 351-52) but had a normal EEG and brain MRI (Tr. 350, 353).

Prior to her alleged onset of disability, plaintiff experienced two orthopedic injuries, each of which resulted in lengthy treatment and surgery. First, on January 29, 2009, plaintiff reported to Dr. Mohammad Pasha, her physiatrist at Norwich Orthopedic Group ["NOG"], that she slipped on ice outside of Mohegan Sun Casino on December 22, 2008, landed on her left buttock and lower back, and experienced pain ranging from a three to a seven and that increased with standing, walking, twisting, and rotating. (Tr. 406-07). X-rays of plaintiff's lumbosacral spine and hip were unremarkable, and Dr. Pasha diagnosed plaintiff with low back pain with left lumbar radiculitis and left groin pain; he prescribed her Naprosyn, Flexeril, and Darvoset, and allowed her to perform work at full duty without restriction. (Id.). An MRI of plaintiff's lumbar spine in February 2009 revealed subtle central/left paracentral disc bulging at L3-4 and L4-5; plaintiff was prescribed Prednisone 40mg for ten days and Neurontin 300-600mg at bedtime, and permitted to continue work at full duty. (Tr. 404-05). Plaintiff continued to experience low back pain which radiated to her lower extremities in April (Tr. 403), May (Tr. 402), June (Tr. 401), July (Tr. 400), August (Tr. 399) and October 2009 (Tr. 398). In October 2009, Dr. Pasha opined that plaintiff had reached maximal medical improvement of her back symptoms unless she would consider an epidural injection. (Id.).

8

On June 2, 2010, plaintiff presented to Backus Hospital reporting a second injury from being rear-ended in her vehicle, resulting in pain and tenderness in her neck and left shoulder. (Tr. 453-56). Plaintiff was diagnosed with cervical strain, sent home in stable condition, and advised to return to her normal activities gradually. (Tr. 454-56).

In June 2010, plaintiff received a lumbar epidural injection at the L5-S1 level, after which she reported that she experienced about fifty percent improvement. (Tr. 396). In July 2010, plaintiff reported that an epidural injection at L4-5 did not reduce her pain and she missed four or five days of work. (Tr. 393). In August 2010, Dr. Pasha placed plaintiff on light duty with restrictions, and referred her to Dr. Kenneth Paonessa, an orthopedic surgeon, for a surgical consultation. (Id.). That month, plaintiff underwent a lumbar spine MRI and a cervical MRI. (Tr. 390-92). In September 2010, Dr. Paonessa noted some bulging at the L3-4 and L4-5 level of plaintiff's lumbar spine, but without severe enough compression to recommend decompression and/or fusion; he opined that plaintiff should continue with conservative care. (Tr. 389). In plaintiff's cervical MRI, Dr. Paonessa identified a small bulge at C4-5 and a significant disc problem with compression of the spinal cord at C6-7; Dr. Paonessa recommended that plaintiff try a cervical epidural injection and, if that did not improve her pain, he would refer her for surgical treatment. (Tr. 388).

Plaintiff's neck pain continued in September 2010, and Dr. Pasha ordered an EMG and referred her to Dr. Tarik Kardestuncer, an orthopedist at NOG. (Tr. 385). Dr. Kardestuncer performed a physical examination and reviewed plaintiff's EMG, finding that plaintiff had "significant intrinsic weakness[]" on the left side and decreased sensation in

the ulnar nerve distribution. (Tr. 383-84). Dr. Kardestuncer opined that plaintiff had "severe findings[]" and was in need of an ulnar nerve transposition. (Tr. 384).

While awaiting this surgery, plaintiff continued to report significant neck and low back pain in October 2010 (Tr. 381-82, 433), which sometimes required her to miss work (Tr. 381). Dr. Pasha opined that after she recovered from the ulnar nerve transposition, he would schedule plaintiff for cervical surgery with anterior surgical diskectomy and fusion of C5-6 and C6-7. (Tr. 382, 433). Plaintiff underwent both the left ulnar nerve transposition (Tr. 377-78, 428-32, 440, 444-47) and the anterior cervical diskectomy with fusion of C5-6 and C6-7 (Tr. 421-32, 435-41) in December 2010.

After the left ulnar transposition, plaintiff continued to report numbness, tingling or pain in her left hand in January (Tr. 375), March (Tr. 372), April (Tr. 370), May (Tr. 367), and July 2011 (Tr. 365). In May, Lisa Shea, Dr. Kardestuncer's PA-C, noted that plaintiff had weak left side interosseous strength compared to her right side and difficulty crossing her left, compared to her right, fingers. (Tr. 367). In July 2011, Dr. Paonessa noted that plaintiff had finished physical therapy but was still reporting a lot of pain in the left side of her neck as well as numbness in the fourth and fifth fingers of her left hand. (Tr. 365). Dr. Kardestuncer opined that plaintiff's hand symptomology may be caused by problems in her neck (Tr. 372), while Dr. Paonessa opined that this symptomology was due to an ulnar nerve problem (Tr. 365, 370).

After surgery in February 2011, plaintiff continued to report significant low back pain that sometimes radiated to her left groin and left knee. (Tr. 374). Dr. Pasha's physical examination found that plaintiff had painful internal and external rotation of her left hip, and mild to moderate tenderness in the lumbar area. (Id.). Dr. Pasha opined that

plaintiff had persistent low back pain, disc protrusions at L3-4 and L4-5, and possible left lumbar radiculopathy, and referred her for evaluation of possible left hip internal derangement. (Id.). Plaintiff reported ongoing severe low back pain to Dr. Pasha in March 2011, requiring her to miss two days of work. (Tr. 371). In April 2011, Dr. Daniel Glenney conducted a normal hip examination finding trochanteric bursitis on plaintiff's left hip. (Tr. 368-69). Dr. Glenney offered plaintiff injections, but plaintiff declined because she could not miss work for the potential increased pain post-injection. (Id.). Plaintiff returned to Dr. Pasha in August 2011 with continuing significant back pain and left groin pain that radiated to the left lower extremity; Dr. Pasha advised plaintiff to have an MRI of her left hip and follow up with Dr. Glenney. (Tr. 364). On August 17, 2011, Dr. Glenney examined plaintiff and found no real irritability of her hip, although she did have some pain over the trochanteric flare. (Tr. 363). Dr. Glenney opined that the location of plaintiff's pain suggested a lumbar radicular pain problem, and he deferred to Dr. Pasha on plaintiff's duty status. (Id.).

## 2. MEDICAL RECORDS AT START OF ALLEGED DISABILITY

On August 19, 2011, plaintiff presented to Dr. Pasha in moderate acute distress from lower back pain. (Tr. 362). Dr. Pasha placed plaintiff on light duty with restrictions on lifting weight at work. (Id.). Four days later, on August 23, 2011, Dr. Kardestuncer examined plaintiff for pain in her left thumb. (Tr. 360-61). Plaintiff's numbness had improved since the operation, but she still had some ulnar-sided hand numbness and pain in her left thumb, which was getting worse and affecting her ADLs. (Id.). Dr. Kardestuncer's physical examination revealed mild sensory deficits in the left ulnar nerve distribution, and positive CMC crepitus and CMC grind tests in her left thumb. (Id.). Dr.

Kardestuncer diagnosed plaintiff with CMS arthrosis and prescribed a custom molded orthosis for her left thumb; he also discussed the possibility of treatment with a cortisone shot or surgery, but plaintiff declined. (Id.).

On September 30, 2011, plaintiff presented to Dr. Pasha with low back and groin pain. (Tr. 359). Dr. Pasha refilled plaintiff's Mobic and Zanaflex prescriptions, started her on Neurontin 300mg at bedtime, and advised her to continue home exercises and light duty restrictions at work. (Id.). Plaintiff presented again to Dr. Pasha on November 11, 2011 reporting she was still experiencing back pain that radiated to her lower left extremity, but that she was unable to get authorization from her insurer "to see Dr. Salame[.]" (Tr. 358). Dr. Pasha observed plaintiff was in mild acute distress, and he refilled her prescriptions and advised her to continue with light duty. (Id.).

On November 21, 2011, plaintiff presented to Dr. Paonessa with tingling in her left hand; a burning, weak feeling in the back of her right shoulder blade; and some achiness in the back of her shoulder and base of her neck. (Tr. 356-57). Dr. Paonessa's physical examination noted that plaintiff was able to flex her neck forward to about 60 degrees and extend to about 20 degrees, with 50 degree left and right rotation. (Id.). Plaintiff was mildly tender to palpation on her posterior neck, trapezius and upper thoracic area. (Id.). She also experienced some numbness on the fourth and fifth fingers of her left hand. (Id.). Dr. Paonessa reviewed plaintiff's diagnostic imaging and opined that her neck had reached maximal medical improvement. (Id.).

On December 2, 2011, plaintiff returned to Dr. Pasha after an independent medical examination ["IME"], reporting that her insurer had still not authorized an evaluation by Dr. Salame. (Tr. 355). Plaintiff reported that she was experiencing moderate low back

pain and was unable do to her current job. (Id.). Dr. Pasha reviewed the IME report done by Dr. Willets, who reported that plaintiff can do her job and has reached maximal medical improvement; Dr. Pasha opined that he wanted to wait for plaintiff to be evaluated by Dr. Salame before opining on maximal medical improvement and impairment ratings. (Id.). On December 20, 2011, diagnostic imaging of plaintiff's lumbar spine was performed at Backus Hospital. (Tr. 420). Dr. Nathaniel Dueker opined that plaintiff had mild to moderate lower lumbar degenerative disk disease and facet changes. (Id.).

On February 16, 2012, plaintiff returned to Dr. Pasha reporting that her most recent flare-up of low back pain was so severe that she had to go to the emergency room; she also reported a flare-up of neck pain. (Tr. 354). Plaintiff wanted to see Dr. Paggioli for pain management. (Id.). Dr. Pasha's physical examination revealed mild to moderate paralumbar muscle spasm and diffuse tenderness. (Id.). The range of motion in both of plaintiff's hips was within normal limits. (Id.). Dr. Pasha diagnosed plaintiff with chronic low back pain with small disc protrusion at L3-4 and L4-5, and referred her to Dr. Paggioli. (Id.). Dr. Pasha opined that plaintiff was on permanent light duty, and he rated her at 10% lumbar spine impairment as of January 6, 2012. (Id.). On February 28, 2012, a radiologist at Backus Hospital examined plaintiff's left hip, which showed only mild degenerative changes. (Tr. 419).

Plaintiff presented to Backus Hospital on May 3, 2012, complaining of moderate and constant dizziness for two weeks. (Tr. 408-18). Plaintiff reported that it was difficult for her to stand or walk, but she walked without an assistive device. (Id.). Dr. Richard Goulding, an Emergency Department physician, noted that plaintiff denied musculoskeletal complaints, had a strong grasp with both hands, and was oriented, alert, awake, able to

follow commands, and able to wiggle her toes. (Tr. 410, 411, 413). Plaintiff was deemed a fall risk with a pain intensity rating of eight. (Tr. 413). Plaintiff "walked around [the] department and report[ed] feel[ing] much better[.]" (Tr. 411). She was discharged home for self-care that day. (Tr. 414-15).

Dr. Ralph LaGuardia began treating plaintiff on August 1, 2013. (Tr. 468-69, 474-75). Plaintiff's medical history described cervical radiculopathy and chronic pain in her left arm since the motor vehicle accident, as well as lumbosacral injuries with L3-L4, L4-L5, and L5-S1 disk herniations in her back, which were moderately relieved by the surgery on her cervical spine. (Id.). Plaintiff complained of whole-body pain, chronic nausea, severe reflux, severe insomnia, neck pain with trapezial muscle spasm bilaterally, cramps in her legs and feet, irritable bowel syndrome, and chronic bronchitis. (Id.). Plaintiff's only medication at that time was Mobic. (Id.). Dr. LaGuardia's physical exam found symmetric trigger points of fibromyalgia; her posterior neck was very tender, as was her straight leg raises and palpation of the lower back bilaterally. (Tr. 469, 475). Dr. LaGuardia noted that plaintiff's cervical/lumbosacral radiculopathy was being treated by Dr. Paonessa; he opined that plaintiff had osteoarthritis with fibromyalgia, but because plaintiff had no health insurance he did not run lab tests on her. (Id.). Dr. LaGuardia discontinued Mobic and gave plaintiff samples of Celebrex and Savella. (Id.).

On September 6, 2013, plaintiff presented to Dr. LaGuardia complaining of severe pain which prevented her from working and performing ADLs. (Tr. 472-73). Dr. LaGuardia prescribed MS Contin 15mg twice daily, and Sinequan 50mg as needed at bedtime for sleep. (Id.). On September 23, 2013, plaintiff returned to Dr. LaGuardia complaining of vertigo, nausea, and facial pain in her maxillary sinus area. (Tr. 471). Plaintiff tested

positive for babesiosis and was started on Atovaquone 750mg twice daily, and Zithromax. (Id.). Dr. LaGuardia opined that plaintiff had severe fibromyalgia, and lumbosacral disk herniation with lumbosacral radiculopathy. (Id.). Dr. LaGuardia reported that plaintiff showed no signs of abuse, divergence or drug seeking behavior. (Id.). Plaintiff's straight leg raises were positive, palpation of her lower back was tender, and reflexes were slightly diminished in the ankle and patella areas. (Id.). Dr. LaGuardia noted he would monitor how plaintiff responded to the Atovaquone and Zithromax. (Id.).

Plaintiff returned to Dr. LaGuardia on October 10, 2013, and reported that her sinusitis and vertigo had resolved after the treatment for babesiosis, and that the Atovaquone and Zithromax had helped with her aches and pains, although she still had lumbosacral radiculopathy confirmed by straight leg raises and palpation of her lower back with cervical radiculopathy and tenderness to palpation of her neck. (Tr. 470). Dr. LaGuardia increased plaintiff's MS Contin prescription to 30mg, twice daily, to better manage pain. (Id.). Plaintiff returned to Dr. LaGuardia on November 14, 2013, and reported that the MS Contin 30mg was not controlling her pain. (Tr. 487). Plaintiff's leg raises were positive and palpation of her lower back and posterior neck were still tender bilaterally. (Id.). Dr. LaGuardia would not raise the dosage of her MS Contin, and prescribed her Gralise. (Id.). Plaintiff returned on December 5, 2013, reporting that she discontinued the Gralise because it did not help manage her pain and gave her dry mouth and mental status changes. (Tr. 486). Plaintiff's lungs also showed "a mild expiratory wheeze." (Id.). Dr. LaGuardia prescribed her 80mg of Depo Medrol IM, and placed her on Prednisone. (Id.). He informed her that he was "running out of options for her, as far as controlling her pain." (Id.).

On March 19, 2014, plaintiff presented to Dr. LaGuardia with loud mid to end expiratory wheeze without rales or rhonchi. (Tr. 484, 531). Pulmonary function testing showed a probable restriction. (Id.). Dr. LaGuardia ordered a chest x-ray, which revealed an asymmetrical density in the upper right lung. (Tr. 484, 493). Dr. LaGuardia prescribed Prednisone. (Tr. 484, 531). Plaintiff had a CT scan of her chest on March 26, 2014, which found asymmetric density in the upper right lung, mild to moderate atherosclerotic calcifications of the aorta, coronary artery calcification, bilateral apical pleural thickening and fibrotic changes, calcified nodule in the left breast, and fatty infiltration of the liver. (Tr. 489, 500, 551, 561).

On April 22, 2014, Dr. LaGuardia restarted plaintiff's prescription for morphine 30mg, twice daily; palpation of her neck was very tender, more so on the left than right. (Tr. 529-30). Plaintiff appeared to have three trigger points on her left side at C4, C5, and C6. (Id.). Dr. LaGuardia injected all three with Depo Medrol and lidocaine and plaintiff experienced immediate relief. (Id.). Dr. LaGuardia looked at the CT scan of plaintiff's chest and observed increased upper lobe emphysema; he told plaintiff that she needed to quit smoking. (Id.). Dr. LaGuardia noted that plaintiff showed no sign of abuse, divergence, or drug-seeking behavior, but that without medication plaintiff cannot participate in ADLs. (Tr. 530).

Plaintiff presented to Dr. LaGuardia on July 3, 2014 with nausea and vomiting that she associated with the MS Contin 30mg prescription. (Tr. 522).[5] He changed her prescription to a Fentanyl patch, 25mg, every three days. (Id.). Plaintiff's main complaint that day was from left knee pain, and Dr. LaGuardia injected her knee joint with 80mg of

---

[5]The second page of this medical report is missing.

Depo-Medrol and 2ml of lidocaine. (Id.). On August 14, 2014, plaintiff reported to Dr. LaGuardia that the Fentanyl did not help her, but her knee tendinitis was better. (Tr. 519, 521). Dr. LaGuardia prescribed Dilaudid 2mg every eight hours, as needed. (Id.).

On October 9, 2014, Dr. LaGuardia changed plaintiff's prescription to Percocet 10/325 t.i.d. (Tr. 516). In October 2014, Dr. LaGuardia referred plaintiff to a pain management doctor. (Tr. 514-15). On November 9, 2014, plaintiff had an MRI of her cervical spine at Backus Hospital, which revealed degenerative disk and joint disease. (Tr. 535). On November 13, 2014, Dr. LaGuardia reviewed plaintiff's MRI and opined there were osteophytes in her lumbosacral back, but no change since August 2010. (Tr. 513). Dr. LaGuardia noted that plaintiff was in a lot of pain, but he declined to give her any further pain medication. (Id.). Dr. LaGuardia prescribed Prednisone 10mg daily "as a baseline." (Id.). Plaintiff returned on December 30, 2014, and told Dr. LaGuardia that she had stopped taking the Prednisone after a few weeks because she did not think it helped her. (Tr. 512). After discussing it at length, plaintiff acknowledged that she actually did feel improvement on the Prednisone but just "stopped taking it." (Id.). Dr. LaGuardia told her to resume taking Prednisone (id.) and referred her to Dr. Sandeep Varma from the Rheumatology Department, observing she may have some polymyalgia rheumatica. (Id.).

On January 17, 2015, plaintiff presented to Dr. Varma for evaluation of back pain, neck pain, joint pain, and non-restorative sleep. (Tr. 509-11). Plaintiff reported that pain in her neck and low back were her biggest concerns, but that her thumbs and knees also bothered her. (Tr. 509). At that time plaintiff was taking Prednisone, Ibuprofen, and Proventil. (Tr. 509-10). Upon physical examination, Dr. Varma noted that plaintiff's DIP and PIPs were tender; her first CMC was tender bilaterally; her elbows were tender over

the lateral aspect; her shoulders had AC joint tenderness; the flexion, extension and lateral rotation of her neck was limited; her ankles were tender; her knees were tender over the medial joint line; her hips were tender over the lateral aspect; and her lower lumbar spine was tender on palpation. (Tr. 510). Dr. Varma's impression was that "clinically [this] mostly looks like osteoarthritis along with fibromyalgia." (Id.). He did not see any evidence of inflammatory disease. (Id.). The MRI of plaintiff's neck and lumbar spine both showed osteoarthritis. (Id.). Dr. Varma recommended that plaintiff quit smoking and continue her regular range of motion exercises; if her symptoms worsened, they would consider looking at inflammatory markers for evidence of inflammatory disease. (Tr. 511).

### 3. EVIDENCE SUBMITTED TO APPEALS COUNCIL

On August 4, 2015, plaintiff presented to Dr. David Coletti, a surgeon at Backus Hospital, to whom she was referred after her chest CT revealed a complete occlusion of the left subclavian artery. (Tr. 8-10). Plaintiff had monophasic flow in the left subclavian artery and some reversible flow in the left vertebral artery, but no profound disequilibrium. (Tr. 8). Plaintiff reported experiencing "some lower extremity weakness and significant claudication in the buttocks, thigh and cast [sic] bilaterally." (Id.). Dr. Coletti noted that plaintiff exhibited "significant noncompliant behavior from a clinical standpoint." (Tr. 10). He opined that plaintiff has lower extremity claudication with probable vascular neuropathic change secondary to aortoiliac occlusive disease. (Id.). Dr. Coletti ordered an arterial ultrasound of plaintiff's lower extremities, and suggested a CT angiogram to define the extent of her lower extremity symptoms. (Id.). He noted that plaintiff was resistant to taking aspirin or statin therapy, and to quitting smoking; he

suspected that, given her vascular disease, her "noncompliant behavior will challenge any medical treatment[,]" and he "will see the patient back but [] likely not be treating [her] surgically given her approach to [his] care recommendations." (Id.).

On August 18, 2015, Dr. Coletti noted that the arterial ultrasound of plaintiff's lower extremity revealed monophasic flow at the feet and lower extremities and opined that plaintiff has significant aortoiliac occlusive disease which required a CT angiogram for surgical planning, and that plaintiff must stop smoking prior to the surgical intervention. (Tr. 11-13). Plaintiff had the CT angiogram on August 25, 2015, and the findings demonstrated diffuse atherosclerotic disease within the abdominal aorta without focal stenosis or aneurysmal dilatation; small ulcerative plaques were noted in the distal thoracic aorta. (Tr. 22-23). High grade stenoses were noted in her pelvis, and artherosclerotic plaque was seen within the right internal and external iliac artery. (Id.). Dr. Herb Lustberg opined that the CT angiogram demonstrated bilateral common iliac artery origin stenoses with small caliber common and external iliac arteries, and cholelithiasis and left renal cyst. (Tr. 23).

On September 1, 2015, Dr. Coletti opined that plaintiff had left upper arm paresthesia in a known left subclavian artery occlusion without left arm rest pain; lower extremity claudication at twenty-five to fifty feet with intermittent rest pain; and monophasic flow in the pedal vessels observed in her arterial ultrasound. (Tr. 14-16). Plaintiff's CT angiogram demonstrated high-grade bilateral common iliac artery occlusive disease with small external iliac vessels with diffuse atherosclerosis. (Id.). Dr. Coletti opined that plaintiff needed a consultation with Dr. Lustberg for consideration of a bilateral common iliac artery angioplasty and stent placement. (Tr. 16). Plaintiff had a

interventional radiology consultation on September 15, 2015, at which time she presented with bilateral lower extremity weakness and pain while walking. (Tr. 20-21). She complained of difficulty walking around her home without pain in her legs, buttocks and thighs. (Id.).

Plaintiff presented to Dr. Coletti on November 5, 2015, after being stented by Dr. Lustberg in September. (Tr. 17-19). Plaintiff had a bilateral iliac artery angioplasty and stent placement, and followed up for a post-operative vascular discussion. (Id.). Plaintiff continued to have back and bilateral knee pain, but the paresthesia in her lower extremity and claudication resolved. (Tr. 17-18). Dr. Coletti diagnosed plaintiff with artherosclerosis of unspecified type of bypass grafts of the extremities with intermittent claudication, and he opined that she would benefit from aspirin, Plavix, a statin regimen for peripheral artery disease, and yearly ultrasounds. (Tr. 18-19).

C. MEDICAL OPINIONS/EXAMINATIONS

The state agency's case analysis determined that plaintiff has a primary medically determinable impairment of severe discogenic and degenerative back disorder, and a secondary severe impairment of fibromyalgia; plaintiff was evaluated for Listing 1.04, Spine Disorders. (Tr. 95). On September 11, 2013, Dr. Richard Papantonio, a non-examining State-agency physician, completed a Physical Residual Functional Capacity Assessment of plaintiff in which he opined that plaintiff can occasionally lift twenty pounds; frequently lift ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; push and/or pull without limitation; frequently climb ramps/stairs; never climb ladders, ropes or scaffolds; frequently balance; occasionally stoop; occasionally kneel; occasionally crouch;

and occasionally crawl. (Tr. 95-97). Dr. Papantonio opined that plaintiff had no manipulative limitations, visual limitations, or communicative limitations, but did have environmental limitations from her history of asthma and vertigo such that she should avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. 97). On November 7, 2013, Dr. Firooz Golkar reached the same conclusions as Dr. Papantonio, except that he opined that plaintiff can only occasionally climb ramps or stairs or balance, and added the environmental limitations of avoiding concentrated exposure to noise and vibration. (Tr. 106-07).

### III. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. See Gonzalez v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of

the ALJ's factual findings. See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. See 42 U.S.C. § 405(g); see also Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

IV. DISCUSSION

Following the five step evaluation process,[6] ALJ Boyd found that plaintiff remained insured under the Social Security Act through December 31, 2016 (Tr. 35), and has not engaged in substantial gainful activity since August 19, 2011 (id., citing 20 C.F.R. § 404.1571 et seq.). The ALJ concluded that plaintiff has the severe impairments of "status post left ulnar nerve transposition, status post cervical spinal surgery, cervical/lumbosacral radiculopathy, chronic obstructive pulmonary disease ["COPD"], and fibromyalgia[,]" (Tr. 36, citing 20 C.F.R. § 404.1520(c)), but that plaintiff does not have an impairment that meets or medically equals the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 36-37, citing 20 C.F.R. §§ 404.1520(d), 404.1525, and

---

[6]An ALJ determines disability using a five-step analysis. See 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. Id. If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. See 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. § 404.1520(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. See 20 C.F.R. § 404.1520(a)(4)(iii); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. See 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. § 404.1520(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

404.1526). At step four, the ALJ found that plaintiff had the residual functional capacity ["RFC"] to perform light work as defined in 20 C.F.R. § 404.1567(b), except that she can never climb stairs, ladders, ropes, or scaffolds; she can occasionally balance, stoop, crouch, and climb ramps; she can never kneel or crawl; she can frequently handle and finger; she can reach overhead with the right upper extremity but not with the left upper extremity; and she cannot work in exposure to cold. (Tr. 37-43). The ALJ concluded that plaintiff is capable of performing her past relevant work ["PRW"] as a slot machine attendant, and that such work does not require work-related activities precluded by plaintiff's RFC. (Tr. 43, citing 20 C.F.R. § 404.1565). Accordingly, the ALJ concluded that plaintiff has not been under a disability from August 19, 2011 through the date of the decision. (Tr. 44, citing 20 C.F.R. § 404.1520(f)).

Plaintiff moves for an order reversing the decision of the Commissioner, arguing that substantial evidence does not support the ALJ's conclusion that plaintiff was capable of light work (Dkt. #14, Brief at 8-18), and that the Appeals Council erred by failing to consider newly submitted evidence (id. at 18-19). Defendant counters that the ALJ's RFC finding is supported by substantial evidence (Dkt. #20, Brief at 8-14), and that the new evidence submitted to the Appeals Council does not provide a basis for changing the ALJ's decision (id. at 15-16).    In her reply brief, plaintiff responds that the ALJ applied the wrong standard regarding plaintiff's assertion of pain, including his conclusion that plaintiff had not complained about pain and had refused pain management (Dkt. #24, at 1-4, 8-10), and the ALJ's determination that plaintiff can sustain work at the light exertional level is not supported by substantial evidence (id. at 4-8).

<u>A. THE ALJ'S RFC FINDING FOR LIGHT WORK</u>

Plaintiff argues that the ALJ erred[7] in determining that plaintiff's RFC allows her to do light work, including her past relevant work at Mohegan Sun Casino (Dkt. #14, Brief at 11-18), particularly with respect to her hands (<u>id.</u> at 8-10), neck and back (<u>id.</u> at 10-12), and the impact of pain on her RFC (<u>id.</u> at 12-15). However, by misstating the standard of review, plaintiff misrepresents the fundamental issue before this Court. The primary question for this Court is not whether the evidence relied upon by the ALJ "outweighs the substantial evidence in the record that supports the plaintiff's allegations[,]" (Dkt. #14, Brief at 8) but whether substantial evidence supports the Commissioner's determination. This court, as noted in Section III <u>supra</u>, will not evaluate which position has more support in the record, nor inquire whether substantial evidence supports the plaintiff's claims. <u>See Bonet ex rel. T.B. v. Colvin</u>, 523 F. App'x 58, 59 (2d Cir. 2013)("[W]hether

---

[7]Plaintiff's brief repeatedly insinuates that the review of the record by ALJ Boyd, and by ALJs generally, is colored by an intention to deny disability benefits. Before arguing his client's case, plaintiff's counsel opines:

> There appears to be an unspoken assumption on the part of [ALJs] that people who have worked hard all their lives will suddenly decide that, despite the fact that they are still able to work, they prefer to quit, and endure months to years of reduced or no income, all on the slim chance that they will be awarded Social Security Disability benefits.

(Dkt. #14, Brief at 7.) Plaintiff's counsel proceeds to allege that, in the instant case, ALJ Boyd "ignored everything in this record that did not suit his thesis[]" (<u>id.</u> at 10), made a "habit of cherry picking" from plaintiff's ADL report while "studiously" ignoring the rest of the report (<u>id.</u> at 15), noted plaintiff's admitted ability to do light chores because it "is the only thing on the form the ALJ could turn to his advantage[,]" (<u>id.</u> at 16), ignored the bulk of plaintiff's testimony and "applied the worst possible adverse spin to what he accepts[,]" (<u>id.</u> at 17), and "mischaracterized" information in order to form conclusions that contradict the evidence in the record (<u>id.</u> at 18).

Plaintiff's baseless accusations of partiality are both inappropriate, and ineffective advocacy for his client. In her more than thirty years of reviewing administrative records in Social Security appeals, this record is hardly one that calls for sharp criticism by this judicial officer of the ALJ's analysis and conclusions, something that she does not hesitate to do, when warranted.

there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports the ALJ's decision.")(emphasis in original), citing Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013). The court's inquiry is limited to whether there is substantial evidence in support of the Commissioner's decision, even if this court would have found otherwise. Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982)("[F]actual issues need not have been resolved by the Secretary in accordance with what we conceive to be the preponderance of the evidence."), cert. denied, 459 U.S. 1212 (1983).

When evaluating symptomology like pain, the ALJ will consider the extent to which a claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 404.1529(a). Symptoms such as pain can only be found to affect a claimant's ability to do basic work activities when the claimant has a medically determinable impairment that could reasonably be expected to produce those symptoms. 20 C.F.R. § 404.1529(b). Once there is a medically determinable impairment that could reasonably be expected to produce a claimant's symptoms, the ALJ evaluates the intensity and persistence of those symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. § 404.1529(c).

The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible. (Tr. 38). The claimant has the burden to demonstrate functional limitations that preclude any substantial gainful activity. See 42 U.S.C. § 423(d)(5)(A)("An individual shall not be

considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); 20 C.F.R. § 404.1512(c)("You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled. You must provide evidence . . . showing how your impairment(s) affects your functioning during the time you say you are disabled . . . ."). Accordingly, the Court must review whether the ALJ properly evaluated the intensity, persistence, and limiting effects of these symptoms to determine the extent to which they limit plaintiff's functioning.

## 1. UPPER EXTREMITIES

The ALJ reviewed plaintiff's longitudinal treatment record reflecting mild clinical signs, numerous findings of upper extremity strength, and limited treatment for her neck and upper extremity symptoms (Tr. 39), and found that plaintiff's back and neck pain with radiculopathy to her upper extremities do not limit her to the extent she alleged. (Tr. 38). He opined that plaintiff has a greater ability to lift and carry than she alleged at the hearing, but that she has some manipulative and overhead reaching limitations specified in his RFC finding. (Tr. 39-40).

Plaintiff alleges that the ALJ improperly ignored evidence about her hands "that did not suit his thesis[,]" including Dr. Kardestuncer's notes reflecting some right-hand weakness with positive CMC crepitus and CMC grind tests, a prescription for a custom-molded orthosis for her thumb, and a discussion of surgical treatment options. (Dkt. #14, Brief at 9-10). To the contrary, the ALJ accurately discussed Dr. Kardestuncer's records, including that in August 2011, Dr. Kardestuncer noted only "mild sensory deficits in the left ulnar nerve distributions[,]" 5/5 intrinsic strength in the left hand, and imposed no

26

duty restrictions on plaintiff. (Tr. 38, <u>referring to</u> Tr. 360). The ALJ reasonably concluded that these records "suggest[] that [plaintiff] had retained full manipulative ability." (<u>Id.</u>). Although plaintiff argues that the ALJ erred by "fail[ing] to incorporate meaningful grasping and fingering limitations into his RFC[,]" (Dkt. #14, Brief at 10) Dr. Kardestuncer himself declined to impose any manipulative limitations when describing plaintiff's duty status. (Tr. 360). Plaintiff argues that it is "impossible" to find, as the ALJ did, that plaintiff retained full manipulative ability given that her "left thumb was so arthritic that her doctor was suggesting surgery." (Dkt. #14, Brief at 10). The record reflects, however, that Dr. Kardestuncer did not advise surgical treatment for plaintiff's left thumb; he noted that he and the plaintiff "talked about a cortisone shot or surgery[,]" but that plaintiff did "not want any of those interventions[]" and opined that a custom molded orthosis "can be very effective." (Tr. 360).

Plaintiff further argues that the ALJ ignored medical records documenting plaintiff's complaints of a "burning, weak feeling in the back part of her shoulder blade," or Dr. Paonessa's description of plaintiff's duty status as "activities as tolerated." (Dkt. #14, Brief at 10, <u>referring to</u> Tr. 356-57). While the ALJ does not specifically mention these reported symptoms, he discusses the medical records from this evaluation at length, noting that Dr. Paonessa found full motor strength and reflexes in both her upper extremities and plaintiff's neck to be only mildly tender to palpation; Dr. Paonessa also reviewed AP and lateral cervical spine and lateral flexion/extension cervical spine x-rays, opining that there was healing and no other changes in instrumentation between C5, C6 and C7, with no sign of movement within the C5 to C7 level. (Tr. 38-39, <u>citing</u> Tr. 356-57). The ALJ noted

that Dr. Paonessa opined that plaintiff's neck reached maximum medical improvement and only needed to be treated on an as-needed basis. (Tr. 39, <u>citing</u> Tr. 356-57).

The ALJ accurately noted that from November 2011 through August 2013, plaintiff "sought and received almost no treatment for her . . . upper extremity conditions, undermining her allegations of disabling limitations resulting from these impairments." (Tr. 39). In May 2012, Dr. Goulding noted that plaintiff denied musculoskeletal complaints and had a strong grasp with both of her hands. (Tr. 410-11, 413). Dr. LaGuardia's treatment records from August 2013 through November 2014 "are silent for manipulative limitations, loss of upper extremity strength, or limited lift or carry ability." (Tr. 39).

Plaintiff argues that in evaluating the condition of plaintiff's neck and shoulders, the ALJ erred by relying on Dr. Varma's conclusion that plaintiff has "full power and reflexes[,]" which she argues has no "direct bearing on the functioning of the neck or shoulders." (Dkt. #14, Brief at 11-12). However, Dr. Varma noted plaintiff's central nervous system reflected full power and present reflexes, and expressly advised plaintiff to continue regular range of motion exercises despite complaints of pain and tenderness in her thumbs, knees, and elbow. (Tr. 510-11).

The record provides substantial evidence for the ALJ's conclusion that plaintiff "has greater ability to lift and carry than she alleged at the hearing[,]" (Tr. 39-40) and her upper extremity limitations are properly reflected in the ALJ's RFC.

## 2. PLAINTIFF'S ABILITY TO STAND AND WALK

The ALJ reviewed plaintiff's allegedly limited ability to stand and walk, but found that her medical records of lower back pain and functional limitations reflect that she is less limited than she alleged. (Tr. 39-40). Plaintiff argues that the ALJ failed to consider

how pain might limit her ability to stand and walk in light of repeated "specific pain findings" including tenderness to palpation of the lower back, fibromyalgia trigger points, positive straight leg raises, diminished reflexes in the ankle and patella, and diminished peripheral pulses. (Dkt. #14, Brief at 12-15). She argues that "the issue here is whether a person living with incessant pain can stand and walk [seven] hours out of an eight hour workday." (Id. at 15).

The ALJ noted, however, that in August 2011 plaintiff was placed on light duty with restriction "due to her reported difficulty lifting weights at work." (Tr. 40, citing Tr. 362). In September 2011 and November 2011, Dr. Pasha continued plaintiff on light duty with restrictions (Tr. 358-59) and advised her to continue exercises at home. (Tr. 359). At each examination, Dr. Pasha declined to note any decreased strength, limited range of motion, or impaired gait. (Tr. 358-59). Plaintiff argues that the absence of such notation in her medical records does not mean she did not have difficulty standing or walking, and that "such difficulties are certainly implied by the doctor's frequent characterizations of [plaintiff's] pain as severe." (Dkt. #14, Brief at 13)(citations omitted). However, as defendant notes  (Dkt. #20, Brief at 8), the claimant has the burden to demonstrate functional limitations precluding any substantial gainful activity (see 42 U.S.C. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); 20 C.F.R. § 404.1512(c)), and a "lack of supporting evidence on a matter for which the claimant bears the burden of proof . . . can constitute substantial evidence supporting a denial of benefits." Barry v. Colvin, 606 F. App'x 621, 622 (2d Cir. 2015), citing Talavera v. Astrue, 697 F.3d 145, 153 (2d Cir. 2012). Given the

claimant's burden of proof at this step of the analysis, the ALJ is not required to address whatever plaintiff claims was "implied" by the doctor's characterizations. (Dkt. #14, Brief at 13). The Commissioner is "entitled to rely not only on what the record says, but also on what it does not say." Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983)(citations omitted).

While plaintiff suggests that some of plaintiff's doctors do "not appear to make a habit of relating . . . patient's functional complaints," (Dkt. #14, Brief at 12-13), many of plaintiff's doctors, upon repeated examination, decline to note impairments in plaintiff's gait, ability to stand, or ability to walk comparable to those plaintiff alleges here. In November 2011, for example, Dr. Paonessa noted that plaintiff had a normal gait, did not note any impairment in her ability to stand or walk, and described her duty status as "activities as tolerated[.]" (Tr. 356-57). In February 2012, Dr. Pasha evaluated plaintiff's claims of severe back pain; he did not note any standing or walking impairments, advised her to be on light duty and rated her at ten percent lumbar spine impairment. (Tr. 354). In May 2012, plaintiff presented to William Backus Hospital for dizziness, where she "walked around [the] department[,]" and denied any musculoskeletal complaints. (Tr. 410-11). Plaintiff did not seek further treatment for her low back, hip, and leg impairments until August 2013, at which time she began treatment by Dr. LaGuardia. (Tr. 468-69, 474-75).

The ALJ reviewed Dr. LaGuardia's treatment records from August 2013 through December 2014 and found that plaintiff experienced pain and resulting limitations, but not of the intensity she alleged at the hearing. (Tr. 40-41). Although Dr. LaGuardia consistently noted tenderness to palpation of the lower back, fibromyalgia trigger points,

positive straight leg raises, and diminished reflexes of the ankle and patella (Tr. 468-69, 470-73, 474-75, 486, 513-16, 522, 529-30), plaintiff only once demonstrated decreased lower extremity strength and did not complain of gait abnormality, difficulty standing, or difficulty walking. (Tr. 40). Although in April 2014, Dr. LaGuardia opined that without medication plaintiff "cannot participate in activities of daily living[,]" (Tr. 530), by November 2014 he declined to give plaintiff further pain medication because she "does not need it." (Tr. 513). As the ALJ noted, plaintiff's "lack of reported problems with ambulation as well as the findings for full lower extremity strength" support that plaintiff can stand and walk to the parameters suggested in his RFC finding. (Tr. 41).

The ALJ also considered the opinions of state agency medical consultants Drs. Papantonio and Golkar. The ALJ gave Drs. Papantonio and Golkar's opinions some weight, noting that their recommended restriction of plaintiff to light work is consistent with plaintiff's documented pain in the upper and lower body. (Tr. 42). However, the ALJ found that the record supported additional manipulative, postural and environmental limitations than those opined by the state agency medical consultants. (Id.). The ALJ found that plaintiff's history of left arm and neck surgery, as well as lower back pain with radiculopathy required additional limitations (id.), including that plaintiff can never climb stairs (Tr. 37, 96), can only occasionally balance or climb ramps (Tr. 37, 96), can never kneel or crawl (Tr. 37, 96), can frequently handle and finger, and cannot reach overhead with the left upper extremity (Tr. 37, 97); the ALJ further found that plaintiff's history of shortness of breath related to COPD required that plaintiff not work in exposure to cold (Tr. 37, 41, 97). Substantial evidence supports the ALJ's RFC finding related to standing and walking.

### 3. PLAINTIFF'S CREDIBILITY

When evaluating symptomology like pain, the ALJ will consider the extent to which a claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 404.1529(a). First, the ALJ must find that a claimant's medically determinable impairments could reasonably be expected to cause the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b). Only after such a finding is made, the ALJ evaluates the intensity and persistence of those symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. § 404.1529(c). In the instant case, the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible. (Tr. 38).

In evaluating the intensity and persistence of a claimant's symptoms, the agency will consider all available evidence, including history, signs and laboratory findings, and statements from the claimant, the claimant's treating and non-treating sources, and other persons, about how the claimant's symptoms affect her. 20 C.F.R. § 404.1529(c)(1). In evaluating the severity of symptoms like pain, the agency considers, inter alia, a claimant's daily activities; the location, duration, frequency and intensity of a claimant's pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication the claimant has taken to alleviate her pain; and treatment, other than medication, the claimant has received for relief of pain. 20 C.F.R. § 404.1529(c)(3). A claimant's statements about the intensity, persistence and limiting effects of her symptoms are evaluated in light of whether they are consistent with the rest

of the evidence of record. 20 C.F.R. § 404.1529(c)(4). Although an ALJ must take the claimant's reports of pain and other limitations into account, he is not required to accept subjective complaints without question and "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010)(citation omitted). In the instant case, the ALJ found that the credibility of plaintiff's disabling allegations was undermined by significant gaps in her treatment history, denial of musculoskeletal complaints, conservative treatment, failure to follow treatment recommendations, and her admitted ADLs which suggest less extreme limitations than alleged. (Tr. 41-42).

The ALJ noted plaintiff's conservative treatment from Dr. LaGuardia, who treated her primarily with medication until November 2014, at which time he discontinued her pain medication and indicated that she did not need it. (Tr. 41). Plaintiff argues that the ALJ erred in reviewing Dr. LaGuardia's treatment notes because "[i]t seems clear in context that Dr. LaGuardia felt it would be appropriate for a pain management provider to prescribe for the plaintiff." (Dkt. #14, Brief at 13). However, the records plaintiff cites reflect Dr. LaGuardia plainly stating that although plaintiff is in a lot of pain, he "declined to give her any further pain medications[]" and "from what it looks like, she . . . does not need [medication]." (Tr. 513).

The ALJ further found that plaintiff's "admitted activities of daily living are inconsistent with the extreme limitations she alleged." (Tr. 42). Plaintiff argues that the ALJ's characterizations of plaintiff's ADLs, as well as his related medical and credibility conclusions, do not withstand scrutiny because the ALJ "cherry-pick[s]" and mischaracterizes plaintiff's answers on her ADL report. (Dkt. #14, Brief at 15). However,

as plaintiff admits, "[i]t is quite true that . . . [plaintiff] states that she does light chores[.]" (Id.). As discussed by the ALJ, plaintiff testified at the hearing that she cooks, cleans, and shops for her family. (Tr. 42). She further reported that she does light cleaning indoors, but her husband does any cleaning that requires climbing and lifting. (Id.). Plaintiff argues that this testimony is consistent with her claimed limitations because plaintiff "never states what she means by [light chores,]" does not specify how often she shops or cooks, and only cooks sandwiches. (Dkt. #14, Brief at 15). However, plaintiff's reports and hearing testimony consistently reflect that she does "light cleaning" including vacuuming and dusting without reaching (Tr. 68, 211), prepares meals each day (Tr. 192, 210), is thought of by her family as a good cook (Tr. 68), shops in stores (Tr. 208), and drives short distances (Tr. 69, 193, 210).

In evaluating the credibility of a claimant, the ALJ "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012), citing Genier, 606 F.3d at 49. Further, the ALJ's findings merit deference because "[g]enerally speaking, it is the function of the ALJ, not the reviewing court, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 113 (2d Cir. 2010)(citations & internal quotations omitted). The ALJ reasonably found that the evidence before him failed to substantiate plaintiff's alleged functional limitations, and thus reasonably determined that claimant is not entirely credible.

<u>B. NEW EVIDENCE SUBMITTED TO THE APPEALS COUNCIL</u>

On or about March 15, 2016, plaintiff submitted records of treatment by Dr. David Coletti from August 2015 to November 2015 to the Appeals Council; the records reflect that Dr. Coletti identified a "known left subclavian artery occlusion . . . [resulting in] lower extremity claudication at [twenty-five to fifty] feet with intermittent rest pain[.]" (Tr. 14; <u>see also</u> Tr. 7-23). In its decision dated August 24, 2016, the Appeals Council notified plaintiff that it "looked at treatment records from Dr. . . . Colleti[,]" but they do not "affect the decision about whether [plaintiff was] disabled beginning on or before March 10, 2015." (Tr. 2). Plaintiff argues the Appeals Council erred by failing to consider the newly submitted evidence because, while the treatment fell outside the time period examined by the ALJ, "[i]t is a near certainty that . . . plaintiff suffered from this condition prior to the date of the decision[]" because occluded arteries "do not just suddenly happen." (Dkt. #14, Brief at 18-19).

The Social Security regulations expressly authorize a claimant to submit new and material evidence to the Appeals Council when requesting review of the ALJ's decision, without demonstrating good cause. <u>See</u> 20 C.F.R. § 404.970(b); <u>see also Perez v. Chater</u>, 77 F.3d 41, 45 (2d Cir. 1996). The Appeals Council "must consider new and material evidence [submitted by the claimant] if it relates to the period on or before the date of the [ALJ's] hearing decision." <u>Shrack v. Astrue</u>, 608 F. Supp. 2d 297, 302 (D. Conn. 2009)(Smith, MJ), <u>citing Perez</u>, 77 F.3d at 45; 20 C.F.R. § 404.970(b).

"New" evidence is that which has not been considered previously during the administrative process and cannot be cumulative to evidence already contained in the record. <u>Milano v. Apfel</u>, 98 F. Supp. 2d 209, 215 (D. Conn. Mar. 7, 2000)(Martinez, M.J.),

citing Tirado v. Bowen, 842 F.2d 595 (2d Cir. 1988). Defendant refers to Dr. Coletti's treatment records as "[n]ew [e]vidence" (Dkt. #20, Brief at 15), and, as the evidence submitted by plaintiff did not exist at the time of the ALJ's decision, there is no question that the evidence is "new" and that "good cause" existed for her failure to submit this evidence to the ALJ. Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004); Sergenton v. Barnhart, 470 F. Supp.2d 197, 204 (E.D.N.Y. 2007)("Good cause" for failing to present evidence in a prior proceeding exists where the evidence surfaces after the Secretary's final decision and the claimant could not have obtained the evidence during the pendency of that proceeding.)(citations omitted).

"The only issue, then, is whether this evidence is 'material.'" Pollard, 377 F.3d at 193. Medical evidence is material if it is "both relevant to the claimant's condition during the time period for which benefits were denied[,] and probative. . . . The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Secretary to decide the claimant's application differently. . . ." Milano, 98 F. Supp.2d at 215, citing Tirado, 842 F.2d at 597; see also Pollard, 377 F.3d at 193.

In denying plaintiff's request for review, the Appeals Council stated that it:

looked at treatment records from Dr. David Coletti dated August 4, 2015 through November 5, 2015 (19 pages). The Administrative Law Judge decided your case through March 10, 2015. The new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before March 10, 2015.

(Tr. 2)(emphasis added). The Appeals Council rejected the newly submitted evidence because "it is about a later time[,]" (Tr. 2) but "medical evidence generated after an ALJ's decision cannot be deemed irrelevant solely because of timing." Carrera v. Colvin, No. 1:13 CV 1414 (GLS/ESH), 2015 WL 1126014, at *8 (N.D.N.Y. Mar. 12, 2015), citing

Newbury v. Astrue, 321 Fed. App'x 16, 18 n.2 (2d Cir. 2009). "Although the new evidence consists of documents generated after the ALJ rendered his decision, this does not necessarily mean that it had no bearing on the Commissioner's evaluation" of plaintiff's claim. Pollard, 377 F.3d at 193. For example, "subsequent evidence of the severity of a claimant's condition may demonstrate that 'during the relevant time period, [the claimant's] condition was far more serious than previously thought.'" Newbury, 321 Fed. App'x at 18, n.2, citing Pollard, 377 F.3d at 193. Accordingly, "a categorical refusal to consider new and material evidence solely because it was created after the date of the administrative law judge's decision can constitute reversible error." Carrera, 2015 WL 1126014, at *8, citing Pollard, 377 F.3d at 193. In the instant case, the Appeals Council's "cursory, formulaic rejection of the evidence simply because it was generated after the ALJ's decision, without any legal or factual reasoning, is insufficient." Lavango v. Berryhill, No. 16 CV 106 (FPG), 2017 WL 2129491, at *4 (N.D.N.Y. May 17, 2017), citing 20 § C.F.R. 404.970(c)("If [the claimant] submit[s] additional evidence that does not relate to the period on or before the date of the [ALJ's] hearing . . . the Appeals Council will send [the claimant] a notice that explains why it did not accept the additional evidence[.]")(emphasis added).

The evidence at issue here is documentation of medical treatment within eight months of the ALJ's ruling (see Tr. 8-10 (treatment on August 4, 2015), 11-13 (treatment on August 18, 2015), 22-23 (treatment on August 26, 2015), 14-16 (treatment on September 1, 2015), 20-21 (treatment on September 15, 2015), and 17-19 (treatment on November 5, 2015)) and discussing lower extremity weakness, claudication, and pain while walking (Tr. 8, 10-11, 14, 17, 19-20), which are symptoms plaintiff alleged affected

her RFC during the relevant time period. While these symptoms were not previously discussed in relation to a diagnosis of arterial occlusion, "[e]xaminations and testing conducted after the ALJ's decision is rendered may still be relevant if they clarify a pre-hearing disability and/or diagnoses." Carrera, 2015 WL 1126014, at *8, citing Sears v. Colvin, No. 12 CV 570 (MAD/ATB), 2013 WL 6506496, at *6 (N.D.N.Y. Dec. 12, 2013). Defendant notes that plaintiff's lower extremity pain and weakness markedly improved following angioplasty and stent placement (Dkt. #20, Brief at 15, n.2, citing Tr. 19), which strongly suggests that the treatment of her arterial occlusion was related to the lower extremity symptoms plaintiff experienced for years (Tr. 20), including during the relevant time period. Because these records shortly follow the ALJ's decision and clearly relate to the symptoms limiting plaintiff's RFC, the Appeals Council erred in finding that it "does not affect the decision about whether [plaintiff was] disabled" on or before March 10, 2015. (Tr. 2).

In order for the evidence to be material, there must also be "a reasonable possibility that the new evidence would have influenced the Secretary to decide the claimant's application differently." Milano, 98 F. Supp.2d at 215, citing Tirado, 842 F.2d at 597; see also Pollard, 377 F.3d  at 194. Defendant argues that "there is nothing in the record, or Dr. Coletti's notes, showing how, if at all, her arterial occlusion affected her ability to work during the relevant period." (Dkt. #20, Brief at 15). However, Dr. Coletti observed that plaintiff had "complete occlusion of her left subclavian artery with monophasic flow in the left subclavian distal to the occlusion. . . [with] lower extremity claudication[.]" (Tr. 10). Dr. Coletti noted plaintiff had entirely absent pulses of the left and right dorsalis pedis (Tr. 9, 15) and "obvious lower extremity claudication and early

rest pain[.]" (Tr. 11). An arterial ultrasound of plaintiff's lower extremities revealed "monophasic flow at the feet and lower extremities" with "escalating claudication and mild rest pain. . . ." (Tr. 13). Dr. Coletti later noted that plaintiff had "lower extremity claudication at [twenty-five to fifty] feet with intermittent rest pain[.]" (Tr. 14). Plaintiff was referred to Interventional Radiology, where it was noted that plaintiff had weakness and pain while walking that began "approximately [five] years ago and has worsened with time. [Plaintiff] now has difficulty walking around her very small home without pain in her legs." (Tr. 20). Plaintiff was treated with bilateral iliac artery angioplasty and stent placement, after which she still had back pain and bilateral knee pain but no longer had "any lower extremity paresthesias and[/]or claudication[.]" (Tr. 19).

The ALJ found that plaintiff did have pain and resulting limitations related to walking and standing, but "not of the intensity that she alleged at the hearing." (Tr. 40). The evidence at issue, however, "directly supports many of [plaintiff's] earlier contentions" regarding the severity of her symptoms and "strongly suggests that, during the relevant time period, [her] condition was far more serious than previously thought." Pollard, 377 F.3d at 193. In his evaluation of plaintiff's credibility, the ALJ found significant that "her treatment was generally conservative, suggesting that her conditions did not cause the extreme limitations alleged. After the alleged onset date, the claimant was treated primarily with medication and only received steroid injections on two occasions[.]" (Tr. 41)(citations omitted). Based on the new evidence submitted associating plaintiff's lower extremity pain and weakness with left subclavian artery occlusion that required surgical intervention, the ALJ might be persuaded to find that during the relevant time period, plaintiff was actually more limited in her ability to stand and walk than previously

determined. Any additional standing and walking limitations in plaintiff's RFC are probative because the vocational expert testified that the limitation to standing and walking for up to two hours total and sitting for up to six hours total would preclude someone from doing plaintiff's past relevant work. (Tr. 85). Clearly, the post-decision medical records are probative and could influence the Commissioner or ALJ to decide the case differently.

For the reasons stated, plaintiff's claim should be reevaluated considering all the evidence relevant to determine her disability. In light of the medical record before the ALJ and the records submitted to the Appeals Council, the Court finds that the Commissioner's decision was not supported by substantial evidence and that remand is required.

## V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion for Order Reversing the Decision of the Commissioner (Dkt. #14) is <u>granted in part and denied in part such that this case is remanded consistent with this Ruling</u>, and defendant's Motion for an Order Affirming the Decision of the Commissioner (Dkt. #20) is <u>denied</u>.

Dated this 22nd day of January, 2018 at New Haven, Connecticut.


/s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge